**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| HIGH WEST CAPITAL PARTNERS, LLC,<br><br>and<br><br>INTERNATIONAL LIQUIDITY, LLC,<br><br>*Plaintiffs*,<br><br>v.<br><br>GREENBERG & LIEBERMAN, LLC,<br><br>*Defendant.* | Case No. 1:25-cv-04335 |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
PARTIALLY OPPOSED MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

I.       Introduction ................................................................................................ 1

II.      Preliminary Statement on the Law ............................................................ 1

III.     Factual Background .................................................................................... 3

         A.   The Complaint ................................................................................... 3

         B.   G&L's Non-Existent Current Relationship with the Plaintiffs .................... 3

         C.   G&L's Past Proposals to Place Escrowed Assets with the Court ................ 4

         D.   G&L's Documented Inability to Safeguard Escrowed Assets .................... 7

         E.   The Uncertain Current Status of the Escrowed Assets ................................ 8

         F.   G&L's Failure to Observe Necessary Formalities ...................................... 11

         G.   G&L's Misappropriation of Plaintiffs' Assets and Charging Plaintiffs for Fictitious Expenses ............................................................................... 13

         H.   The Continuing Harm Suffered by Plaintiffs .............................................. 17

         I.   Relevant Admissions in G&L's Recently Filed Declaration ...................... 18

IV.      Relevant Law ............................................................................................. 19

V.       Argument .................................................................................................... 22

         A.   Plaintiffs Are Likely to Succeed on the Merits ......................................... 22

              1.   Plaintiffs are likely to prevail on their first claim for declaratory judgment. ....... 22

              2.   Plaintiffs are likely to prevail on their second claim for relief. ........... 24

                   a.   Using Plaintiffs' funds for G&L's own benefit .......................... 25

                        i.   Overnight investment activity ............................................ 26

                        ii.  Fictitious bank and ACH fees .......................................... 29

                   b.   Failing to maintain proper trust accounts for escrowed funds .................... 30

                   c.   Commingling Plaintiffs' funds with G&L funds ......................... 30

         B.   Plaintiffs Will Suffer Irreparable Harm Absent Immediate Relief ........................... 31

i

       1.     Plaintiffs have shown a strong indication that G&L may dissipate assets— knowingly or not ……………………………………………………… 31

       2.     Plaintiffs will suffer other irreparable harm. ....................................................... 34

    C.   The Equitable Factors Strongly Favor Injunctive Relief ........................................... 35

VI.    The Court Should Waive Any Bond Requirement ...................................................... 36

VII.    Plaintiffs' Position on A Hearing.................................................................................. 36

VIII.    Conclusion .................................................................................................................... 37

**TABLE OF AUTHORITIES**

**CASES**

*AFGE v. Dist. of Columbia*, 2005 WL 1017877 (D.D.C. May 2, 2005) .......................................... 20

*Ahmed v. Noem*, 2025 WL 2299447 (D.D.C. Aug. 8, 2025) ................................................................. 1

*Am. Bar Ass'n v. U.S. Dep't of Just.*, 783 F.Supp.3d 236 (D.D.C. 2025) ....................................... 20

*Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277 (D.D.C. 2018) ................................. 22, 34

*Bode & Grenier, LLP v. Knight*, 821 F. Supp. 2d 57 (D.D.C. 2011). ............................................... 25

*Buckner v. Estate of Murray*, 2024 WL 1366785 (D.D.C. Mar. 30, 2024) ....................................... 2

\*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). ..... 1, 19, 35

*Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288 (D.C. Cir. 2009) ......................................... 19

*District Title v. Warren*, 181 F. Supp. 3d 16 (D.D.C. 2014) ...................................................... 20, 33

*FutureGen Co. v. Carter*, 2012 WL 12874177 (D.D.C. May 21, 2012). ............................. 21, 31, 35

*Gov't of Rwanda v. Rwanda Working Group*, 227 F. Supp. 2d 45 (D.D.C. 2002) .......................... 25

\*Griva v. Davison*, 637 A.2d 830 (D.C. 1994) ................................................................................. 25

\*In re Alexander*, 865 A.2d 541 (D.C. 2005) ............................................................................. 26, 29

*In re Berryman*, 764 A.2d 760 (D.C. 2000) .................................................................................... 26

*In re Mitrano*, 952 A.2d 901 (D.C. Ct. App. 2008) ......................................................................... 26

*In re Pierson*, 690 A.2d 941 (D.C. 1997) ........................................................................................ 29

*Kelly v. Hegseth*, ___F.Supp.3d___, 2026 WL 391777 (D.D.C. Feb. 12, 2026) ............................ 20

*Kirwa v. U.S. Dep't of Defense*, 285 F. Supp. 3d 21 (D.D.C. 2017) ................................................ 20

*Lincoln Prop. Co. v. Roche*, 546 U.S. 81 (2005) ............................................................................... 2

*Madison Stock Transfer, Inc. v. Exlites Holdings Int'l, Inc.*,
368 F. Supp. 3d 460 (E.D.N.Y. 2019) ............................................................................................. 22

*Micro Signal Research, Inc. v. Otus*, 417 F.3d 28 (1st. Cir. 2005) .................................................. 20

*Mid-Atlantic Equity Consortium v. U.S. Dep't of Educ.*, 793 F. Supp. 3d 166 (D.D.C. 2025) ....... 20

*Mori v. Int'l Broth. of Boilermakers*, 454 U.S. 1301 (1981) ........................................................ 21

*Nat'l Lifeline Assoc. v. Fed. Cmcn's Comm.*,
2018 WL 4154794 (D.C. Cir. Aug. 10, 2018) ................................................... 21, 31, 34

*P.J.E.S. by and through Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020)..... 19, 36

*Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373 (6th Cir. 1995)................. 2

*Philip Morris USA Inc. v. Scott*, 561 U.S. 1301 (2010)................................................................ 21

*Power Up Lending Group, Ltd. v. Cardinal Energy Group, Inc.*,
2022 WL 426199 (E.D.N.Y. Feb. 11, 2022)........................................................................ 6

*Randolph-Sheppard Vendors of America v. Weinberger*, 795 F.2d 90 (D.C. Cir. 1986) ................. 2

*Robertson v. Cartinhour*, 429 Fed. App'x 1 (D.C. Cir. 2011)................................................. 21, 22

*S. Educ. Found. v. U.S. Dep't of Educ.*, 784 F. Supp. 3d 50, 72 (D.D.C. 2025) ....................... 21, 34

*Sakyi v. Estee Lauder Cos.*, 308 F. Supp. 3d 366 (D.D.C. 2018) ...................................................... 23

*Simms v. Dist. of Columbia*, 872 F. Supp. 2d 90 (D.D.C. 2012) ...................................................... 36

*So v. Suchanek*, 670 F.3d 1304, 1307-08 (D.C. Cir. 2012)........................................................... 25

*Sprint Solutions, Inc. v. Mobile Now, Inc.*, 2020 WL 136285 (D.D.C. Jan. 13, 2020)........... passim

*Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)............................................................. 19, 20

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008). ............................................................ 19

*Wis. Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) ................................................................. 21

*X-Clearing Corp. v. Technology Partners LLC*, 2008 WL 4090028 (D. Colo. Aug. 22, 2008) ..... 22

*Xiaomi Corp. v. Dep't of Defense*, 2021 WL 950144 (D.D.C. Mar. 12, 2021).............................. 33

*Yueh-Lan Wang by and through Winston Wen-Young Wong v. New Mighty U.S. Trust*,
322 F.R.D. 11 (D.D.C. 2017).............................................................................................. 2

**STATUTES**

28 U.S.C. § 1335..................................................................................................................... 5

**RULES**

D.C. Rules of Professional Conduct, Rule 1.15........................................................................ passim

Fed. R. Civ. P. 19(b) ................................................................................................................... 2

Fed. R. Civ. P. 65(c). .......................................................................................................... 37

LCvR 65.1(d). ....................................................................................................................... 37

LCvR 7(f) .............................................................................................................................. 37

v

I.    **Introduction**

Plaintiffs filed their Complaint three months ago in order to reclaim $35,000,000 in escrowed assets that defendant Greenberg & Lieberman ("G&L") improperly holds. In response, G&L acknowledged it had no interest in the escrowed assets but nonetheless asserted that its withholding of such a large amount of funds somehow amounted to a legal fee dispute subject to arbitration. While publicly defending against the Complaint, however, G&L privately has engaged in conduct that puts Plaintiffs' assets at substantial risk of never being recovered. Therefore, Plaintiffs now move for a preliminary injunction with the sole purpose of preserving the status quo by placing all escrowed assets in the neutral hands of the Court.

II.    **Preliminary Statement on the Law**

The Court already has received hundreds of pages of filings in this lawsuit, including the verified Complaint, multiple dismissal motions and responses thereto, and dozens of exhibits. An early detour into the legal underpinnings of this motion is necessary to explain why those prior filings are directed at issues ancillary to the Court's determination of this motion and, concomitantly, why the necessary factual background for this motion largely bypasses the morass of the pending motions.

As the Court is aware, the first showing a party must make to obtain a preliminary injunction is "a substantial likelihood of success on the merits." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "[T]he 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction." *Obama v. Klayman,* 800 F.3d 559, 565 (D.C. Cir. 2015). *See also Ahmed v. Noem*, 2025 WL 2299447, at *8 (D.D.C. Aug. 8, 2025) ("In order to establish a likelihood of success on the merits, a party moving for a preliminary injunction must also

1

establish subject-matter jurisdiction."). In lieu of answering the Complaint, G&L filed motions (1) to compel binding arbitration and to stay proceedings here, ECF No. 6; (2) questioning Plaintiffs' capacity to maintain this action, ECF No. 7; and (3) to compel joinder of a third-party, John Hall, ECF No. 7. The Court plainly has jurisdiction over this action, ECF No. 1 ¶¶2-3, and none of G&L's motions contend otherwise.

For example, joinder here does not present a jurisdictional question; whether or not G&L is correct that John Hall should be joined has no effect on diversity jurisdiction, since Hall is a citizen of Florida. *See Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 90 (2005) ("Both [FRCP 17(a) and FRCP 19], we note, address party joinder, not federal-court subject-matter jurisdiction."); *Randolph-Sheppard Vendors of America v. Weinberger*, 795 F.2d 90, 99 n.12 (D.C. Cir. 1986) (identifying joinder as a jurisprudential issue instead of a jurisdictional one); Fed. R. Civ. P. 19(b) (making dismissal discretionary rather than mandatory, in cases of infeasible joinder).

Nor does the question of Plaintiffs' capacity to maintain this action implicate the Court's jurisdiction. *See Buckner v. Estate of Murray*, 2024 WL 1366785, at *2 n.3 (D.D.C. Mar. 30, 2024) (citing cases for proposition that Rule 9(a) capacity question is not jurisdictional); *Yueh-Lan Wang by and through Winston Wen-Young Wong v. New Mighty U.S. Trust*, 322 F.R.D. 11, 18 (D.D.C. 2017) ("The matter of a person's capacity or authority to sue on behalf of someone else who indisputably has standing to bring the asserted claims does not raise a jurisdictional problem at all.").

Nor does the arbitrability of the claims in the Complaint—indeed, even a ruling compelling mandatory arbitration does not diminish the Court's authority to enter a preliminary injunction. *See Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1380 (6th Cir. 1995) ("[W]e adopt the reasoning of the First, Second, Third, Fourth, Seventh, and

2

arguably the Ninth, Circuits and hold that in a dispute subject to mandatory arbitration under the Federal Arbitration Act, a district court has subject matter jurisdiction under § 3 of the Act to grant preliminary injunctive relief . . . ."); *Sprint Solutions, Inc. v. Mobile Now, Inc.*, 2020 WL 136285, at **7-9 (D.D.C. Jan. 13, 2020) (citing *Performance Unlimited* and granting preliminary injunction while arbitration pending).

With this legal landscape in mind, Plaintiffs below distill the essential facts the Court needs to determine only the instant motion for a preliminary injunction.

### III.    Factual Background

#### A.    The Complaint

On December 13, 2025, Plaintiffs filed a verified Complaint naming G&L as the lone defendant. ECF No. 1. At core, the Complaint alleges that G&L breached its fiduciary duties in a number of ways, is putting roughly $35 million in Plaintiffs' escrowed assets at risk, and improperly refuses to return those same assets. The Complaint includes two claims for relief. First, Plaintiffs seek a declaratory judgment that an arbitration provision in a specific written escrow agreement is unenforceable against the Plaintiffs or otherwise does not encompass the assets at issue between the parties. ECF No. 1 ¶¶34-38. Second, Plaintiffs allege that G&L breached its fiduciary duty of loyalty—by (1) using Plaintiffs' funds for its own benefit, (2) failing to maintain proper trust accounts for Plaintiffs' escrowed funds, and (3) improperly commingling Plaintiffs' funds with G&L's own funds—and therefore seek compensatory damages, injunctive relief, and an accounting. ECF No. 1 ¶¶39-50.

#### B.    G&L's Non-Existent Current Relationship with the Plaintiffs

The Court has received ample briefing on the parties' differing views of G&L's historical relationship with the Plaintiffs. *See* ECF Nos. 6, 8, 13. In sum, G&L alleges a comprehensive

3

attorney-client relationship, and Plaintiffs allege a different relationship that primarily involved G&L providing escrow services.  Resolving that disagreement for purposes of this motion is unnecessary, because under either scenario, G&L owed fiduciary duties to Plaintiffs.  *See, e.g.*, D.C. Rules of Professional Conduct, Rule 1.15, Cmt. 1 ("A lawyer should hold property of others with the care required of a professional fiduciary.").  The parties agree in one important area, though: G&L currently has no relationship with the Plaintiffs and is nonetheless holding approximately $35 million in escrowed assets in which G&L has no interest.  *See, e.g.*, Exhibit A at 4.

### C.    G&L's Past Proposals to Place Escrowed Assets with the Court

Beginning well before Plaintiffs filed the Complaint, G&L repeatedly suggested that it would voluntarily undertake the very relief sought by this preliminary injunction: placing Plaintiffs' escrowed assets in the Court's registry.  But actions speak louder than words, and G&L has never taken any action to do so.

As early as October 18, 2025, G&L claimed that if Plaintiffs continued to "insist on the return" of over $8 million in Plaintiff International Liquidity's escrowed assets, then G&L "will be forced to file in DC superior [sic] Court and deposit all funds in our possession in the court registry." Exhibit B at 1.

Thereafter, on October 28, 2025, Stevan Lieberman—the member and managing partner of G&L—sent a "formal resignation" letter in which Lieberman admitted "that we [G&L] are currently holding funds on behalf of the company." Exhibit A at 4.  Lieberman's resignation letter also was notable for the apparent ease with which he could "consolidat[e] all held funds into a single designated account at Chase for the cash and a separate account at Raymond James to hold the stock." *Id.*  Lieberman asked that settlement and distribution arrangements be made

4

by November 14, 2025, barring which he would "require that the parties engage another escrow agent. Failing such appointment, we will proceed to file and submit all remaining funds with the D.C. Superior Court for appropriate disposition." *Id.*

As G&L's self-imposed deadline approached, Lieberman drafted an interpleader complaint. *See* 28 U.S.C. § 1335 (statutory interpleader permitting placement of disputed funds in court registry). On November 10, 2025, Lieberman sent Plaintiffs and John Hall a "draft complaint which Greenberg & Lieberman will be filing a week from today"—November 17—"if a settlement has not been achieved." Exhibit C at 1. The draft complaint ("First Draft Interpleader") included a number of admissions. First, G&L admitted that it "currently holds the Escrow Assets, which have a current approximate value exceeding twenty-five million dollars ($25,000,000)." *Id.* at 6 ¶14. Second, G&L admitted that it "has no interest in the Escrow Assets other than for its reasonable fees and costs as escrow agent, which it reserves the right to seek from the interpleaded funds." *Id.* at 7 ¶19. Lieberman did not file the First Draft Interpleader by his self-imposed November 17 deadline.

On November 20, Lieberman sent Plaintiffs and Hall another draft interpleader complaint ("Second Draft Interpleader"). Exhibit D. Lieberman stated that, "baring [sic] a settlement," he "will be filing" the Second Draft Interpleader "this coming Monday," which would have been November 24, 2025. *Id.* at 1. The Second Draft Interpleader included the same admissions— that G&L held Plaintiffs' escrowed assets and that G&L had no interest in those assets, *id.* at 4 ¶14 and 5 ¶19—but gave a more specific description of the escrowed assets in G&L's possession:

35,000,000 shares of JGH.AU, 5,794,500 shares of 02531.HK, 47,500,000 shares of BANK.LN, 7,399,000 shares of IMC.LN, 236 shares of GLD.US, 44,000 shares of 08223.HK, 10,000,000 shares of ANI.PM, 3,000 shares of IBIT.US which added to the cash being held in escrow with an estimated value of at least twenty five million ($25,000,000) [*Id.* at 5 ¶24.[1]].

The following day, November 21, Plaintiffs' prior counsel emailed Lieberman, Hall, and others, asking why the Second Draft Interpleader failed to include certain of Plaintiffs' escrowed assets amounting to millions of additional dollars. Exhibit E at 2. On November 23, Lieberman sent yet another draft interpleader ("Third Draft Interpleader") and stated that to allow for further discussion he had "decided to push the filing to Wednesday afternoon," which would have been November 26, 2025. *Id.* at 1. The Third Draft Interpleader had two notable changes: it stripped out the more precise asset definitions that had been added to the Second Draft Interpleader and generically stated that the escrowed assets exceeded $25 million, and it slightly modified G&L's statement that it had no interest in the escrowed assets by excepting unspecified "current" or "past" invoices. Exhibit E at 9 ¶¶28-29 & 10 ¶F.

On November 25—the day before Lieberman's self-imposed deadline for filing the Third Draft Interpleader—Plaintiffs sent G&L a demand letter, putting G&L on notice of certain allegations of breach of fiduciary duty that later featured heavily in the Complaint. Exhibit F. Lieberman then ignored his own deadline for filing the Third Draft Interpleader and did not timely respond to the demand letter. Plaintiffs filed the Complaint shortly thereafter, on December 13, 2025, to preserve their rights—and their assets.

---

[1] The Court can take judicial notice that the abbreviations are symbols for stock traded on various exchanges. *See Power Up Lending Group, Ltd. v. Cardinal Energy Group, Inc.*, 2022 WL 426199, at *11 n.9 (E.D.N.Y. Feb. 11, 2022) (collecting cases and taking "judicial notice of the stock ticker symbol, which is not subject to reasonable dispute"). "JGH.AU" is Jade Gas Holdings Limited in Australia. "02531.HK" is Carlink Tech in Hong Kong. "BANK.LN" is FIINU PLC in London. "IMC.LN" is IMC Exploration Group PLC in London. "GLD.US" is SPDR Gold Trust. "08223.HK" is Ziyuan Yuan Holdings Group Limited in Hong Kong. "ANI.PM" is AgriNurture Inc. in the Philippines. "IBIT.US" is iShares Bitcoin Trust ETF.

Even during the pendency of this action, G&L has continued to suggest that it has no objection to placing Plaintiffs' escrowed assets in the Court's registry.  For example, in a filing on February 13, 2026, G&L represented to the Court that it "does not object to depositing funds into the Court Registry if the Court determines that interpleader is appropriate, subject to appropriate reservations and protection."  ECF No. 6-1 at 4.  And in response to the Local Rule 7(m) conferral on this motion, G&L stated that it consents to the motion with respect to cash assets but does not consent with respect to the securities.  But G&L has failed to take any steps to effectuate the safekeeping of Plaintiffs' escrowed assets.

### D.      G&L's Documented Inability to Safeguard Escrowed Assets

On February 19, 2026, in the United States District Court for the District of Maryland, G&L filed a Second Amended Verified Complaint ("Maryland Complaint") against several individuals and entities (none of which is a party to the instant suit).  Exhibit G.[2]  In the Maryland lawsuit, Lieberman is acting as G&L's attorney and also signed the complaint's verification.  *Id.* at 33.

In the Maryland Complaint, G&L alleges that it suffered a "coordinated cyberattack targeting G&L's cryptocurrency escrow accounts."  *Id.* at 13 ¶36.  More specifically, in G&L's own telling, Lieberman was fooled into providing nefarious actors with the necessary login information for them to access and deplete a cryptocurrency wallet of escrowed assets:

> Through social engineering and/or other means, Defendants caused the spoofed interface to be presented to Mr. Lieberman the only person in the firm with access to G&L's escrow wallets. . . .  Relying on these false representations, Mr. Lieberman entered the recovery phrases and other Confidential Access Information into the spoofed interface, which transmitted that information to

---

[2] As of March 17, much of the Maryland docket is under seal.  For example, the original complaint (filed on January 16, 2026) remained unavailable.  G&L never informed Plaintiffs of the Maryland lawsuit; instead, Plaintiffs discovered the lawsuit shortly after the Second Amended Complaint became publicly available in late February 2026.

Defendants.

*Id.* at 13 ¶¶40-41.  According to the Maryland Complaint, thieves then used the credentials Lieberman provided them to steal from G&L's "attorney escrow accounts," *id.* at 12 ¶32, certain cryptocurrency valued at "approximately $2,700,000," *id.* at 13 ¶42.

According to the Maryland Complaint, a network security firm G&L hired "failed to detect that Mr. Lieberman's laptop was no longer protected after mid-November 2025." *Id.* at 12 ¶33.  The Maryland Complaint does not make clear when the laptop once again became "protected" but it appears to have not been "protected" for at least two months, through at a minimum January 14, 2026, when the escrowed assets were stolen.  The Maryland Complaint goes on to allege—without detail—that an "investigation has made it clear that [the thieves] did not access, view, or exfiltrate any data other than the keys to the crypto through the compromised computer." *Id.* at 12 ¶35.

The same day it filed the Maryland Complaint, G&L moved for an ex parte temporary restraining order against the same individuals and entities.  Exhibit H.  G&L asserted that it would be irreparably harmed without a restraining order because "[t]he threat of dissipation is not speculative—it is the defining characteristic of digital asset theft." *Id.* at 6.  The federal district court denied the motion for a temporary restraining order the day G&L filed it, on several grounds including that G&L failed to offer a basis upon which the court could exert jurisdiction over certain defendants.

**E.     The Uncertain Current Status of the Escrowed Assets**

In one of its pending motions here—filed just days before the Maryland Complaint—G&L claims that "the disputed escrow funds are held by a D.C. law firm in D.C.-maintained trust accounts." ECF No. 7-1 at 8.  The basis for this claim is uncertain: it is an assertion of counsel

unverified by any affidavit,[3] and leaves the unfortunate misimpression that the escrowed assets are located within the District of Columbia.  The record shows otherwise.

According to a spreadsheet G&L provided to Plaintiffs on November 14, 2025, G&L held in escrow for Plaintiffs $8,378,358.12 in U.S. dollars, € 3060.31 in Euros, and over 105 million shares of stock or securities.  Exhibit I at 2.[4]  The vast majority of the U.S. currency was kept in Chase Bank Account x6781 ("Chase x6781").  *See, e.g.*, Exhibit Q.  The stocks and securities, however, were held by G&L in two accounts (Safari x0097 and Safari x0197) at Safari Asia Limited, a Hong Kong company.  Those two accounts were held in G&L's name, according to what Plaintiffs believe are statements for those accounts from October 2025 and December 2025, respectively.  *See, e.g.*, Exhibit R (Safari x0097 from October 2025); Exhibit S (Safari x0197 from December 2025).[5]

However, G&L's spreadsheet from November 14 failed to list at least three other accounts that contain Plaintiffs' escrowed assets.  Two of the accounts are in the name of High West Capital Partners LLC (Safari x0014 and Safari x0314) and the third is in the name of High

---

[3] In a declaration attached to a reply to the motion in which this assertion is made, Lieberman claimed that "[t]he escrow accounts referenced in Plaintiffs' Complaint were escrow and trust accounts maintained by G&L in the ordinary course of its law practice.  G&L did not maintain separate commercial escrow accounts apart from the accounts it maintained as a law firm."  ECF No. 14-1 ¶7.  Lieberman's declaration says nothing about the location of the assets.

[4] The G&L email included other attachments which Plaintiffs have not included in Exhibit I. Moreover, the relevant Excel spreadsheet has additional tabs, but the most relevant tab is included in Exhibit I.  The entire original Excel file is available for the Court's review.

[5] The names and amounts of stock Lieberman identified in the Second Draft Interpleader match the names and amounts of stock in the two Safari Asia accounts held in G&L's name on the October and December 2025 statements.  *Compare* Exhibit D at 5 ¶24 *with* Exhibit R *and* Exhibit S.

West & Co. (Safari x0214).[6]   Plaintiffs obtained statements of these accounts from February 2026.  *See* Exhibit T (Safari x0014); Exhibit AH (Safari x0214); Exhibit AI (Safari x0314).  At that time, Safari x0014 held approximately $1.4 million USD, $1.7 million Hong Kong Dollars, and over 60 million shares of stock.  *See* Exhibit T.  Safari x0214 held over $500,000 USD, $11 million Hong Kong Dollars, 10 billion Indonesian Rupiah, and 146 million shares of stock.  *See* Exhibit AH.  And Safari x0314 held over 345,000 British Pounds and over 38 million shares of stock.  *See* Exhibit AI.[7]

For the 105 million shares of stock in the two accounts on the G&L spreadsheet, Plaintiffs have some recent relevant information: Assuming the stock itself has not been moved or dissipated, some of its value certainly has.  The value of the 105 million shares of stock and securities held in escrow by G&L fluctuates daily with the markets in which they are traded.  For example, on the first business day after Plaintiffs filed the Complaint, the per-share value of 02531.HK stock (Carlink Tech in Hong Kong) was 14.350 Hong Kong Dollars; three months later, on March 16, 2026, the value was 6.270 Hong Kong Dollars—a devaluation of more than 56% during the time G&L held the escrowed asset.  *See* Exhibit R (showing 02531 Carlink stock); Exhibit U (Carlink stock historical price history).  *See also S.E.C. v. Bilzerian*, 814 F. Supp. 116, 123 n.19 (D.D.C. 1993) ("The Court may take judicial notice of closing stock prices pursuant to Federal Rule of Evidence 201.").  Similarly, on the first business day after Plaintiffs filed the Complaint, the per-share value of JGH.AU (Jade Gas Holdings) was 0.0320 Australian

---

[6] High West & Co. was formed by G&L with assets from High West Capital Partners, LLC. ECF No. 1 ¶12.  Plaintiff High West Capital Partners, LLC is the sole member of High West & Co.  Exhibit AD ¶2.

[7] G&L's spreadsheet also did not include mention of Chase x6290, an account in the name of High West & Co. LLC.  *See* Exhibit I.  Plaintiffs' sole member, Paul Jaber, had access to that account until late 2025 but no longer has access to it even though G&L does.  Funds in the account at that time were minimal; Plaintiffs include the account here for completeness and in case the funds therein have grown or been dissipated.

Dollars; three months later, on March 16, 2026, the value was 0.0260 Australian Dollars—a devaluation of over 18% during the time G&L held the escrowed asset. *See* Exhibit R (showing Jade Gas Holdings stock); Exhibit V (Jade Gas stock historical price history). And on the first business day after Plaintiffs filed the Complaint, the per share value of IBIT.US (iShares Bitcoin Trust) was $50.72; three months later, on March 16, 2026, the value was $41.44—a devaluation of over 18% during the time G&L held the asset. *See* Exhibit S (showing iShares Bitcoin Trust stock); Exhibit W (iShares Bitcoin Trust stock historical price history). In total, of the eight securities G&L holds in escrow in the two G&L Safari Asia accounts, five of them appear to have lost value in the last three months; the total devaluation (offset against value increases in some of the other securities) appears to be equivalent to more than $6,000,000 USD.

That said, Plaintiffs have no verified assurance that their tens of millions of dollars in escrowed assets remain in the two accounts (Safari x0097 and Safari x0197) in which the statements said they were in late 2025. G&L has not filed an answer, and the lone declaration submitted with its motions does not speak to the location or amount of the escrowed assets. The only things Plaintiffs know for sure are that some of the escrowed stock held by G&L has substantially diminished in value, and that—by his own admission in the Maryland Complaint—Lieberman has proven incapable of safeguarding escrowed assets.

### F.    G&L's Failure to Observe Necessary Formalities

G&L's failure to comply with important formalities is also a source of concern to Plaintiffs. According to the records described below, G&L is not currently registered to do business in the District of Columbia and its bank accounts are not compliant with the Rules of Professional Conduct.

G&L is an LLC registered in Maryland, but its principal place of business is located at

11

1775 Eye Street NW, Suite 1150, Washington, DC.  ECF No. 1 ¶10.[8]  The District of Columbia requires LLCs such as G&L to register to operate a business in the District.  Apparently mindful of that requirement, Lieberman registered G&L in the District of Columbia in 2018.  Exhibit X. But in or around 2021, G&L failed to file a biennial report and appoint a registered agent, which resulted in the termination of G&L's registration in the District of Columbia.  Exhibit Y; Exhibit Z.  On March 14, 2023, Lieberman cured the grounds for termination—temporarily.  Exhibit Y. Weeks later in April 2023, G&L failed to file another required report, and thereafter G&L's license to operate in the District was "revoked."  Exhibit AA.  It remains "revoked" to this day.[9] *Id.*

G&L's lax approach to regulatory formalities extends to its banking practices.  Rule 1.15(a) and (b) of the D.C. Rules of Professional Conduct requires an attorney to keep a client's funds separate from his own "in one or more trust accounts" at an "approved depository" with each account labeled either an "IOLTA Account" or, as relevant here, a "Trust Account" or "Escrow Account."  G&L kept millions of dollars of Plaintiffs' escrowed assets in Chase x6781. *See, e.g.*, Exhibit Q.  In multiple October 2025 communications with Plaintiffs, Lieberman asserted that Chase x6781 was an "escrow account[]."  Exhibit A at 1 ("Let me be blunt.  6781 and 7230 are escrow accounts which hold multiple client's [sic] funds.  You are not getting the [bank] statements."); Exhibit AB ("Oh, and we finished updating the activity in the escrow account which is attached.").  But Plaintiffs did obtain at least some of the bank statements,

---

[8] That location appears to be a co-working or virtual office space run by Intelligent Office.  *See* https://intelligentoffice.com/usa/dc/washington-dc/.

[9] Moreover, the District of Columbia and Maryland regulate and require licenses for anyone engaging in the business of money transmission. To the extent G&L or Lieberman's conduct fits within the definition of money transmission under either jurisdiction's law, neither G&L nor Lieberman appears to be registered as money transmitters in the District of Columbia or Maryland.  *See* https://www.nmlsconsumeraccess.org/.

12

ultimately, and those statements show that Chase x6781 is in the name of G&L, at the address of G&L's principal place of business in the District of Columbia.  *See, e.g.*, Exhibit Q at 1. Nowhere on the statement is the account identified as a "Trust Account" or "Escrow Account." *Id.*  Indeed, the bank statements do not reflect that Chase x6781 is anything other than a normal "business checking" account in G&L's name.  *Id.*  Further demonstrating that G&L used Chase x6781 for purposes other than trust or escrow services, when G&L sent invoices to Plaintiffs for fees and expenses, G&L frequently directed Plaintiffs to remit the invoiced amounts to the Chase x6781 account—not a separate operating account for G&L.  *See, e.g.*, Exhibit AC at 9, 51, 54, 56, 69, 86.[10]  Those invoices too do not describe the Chase x6781 account as a "trust account" or "escrow account."  Similarly, the Safari Asia statements for Safari x0097 and Safari x0197 are held in G&L's name, and do not suggest that they are "trust accounts" or "escrow accounts." *See, e.g.*, Exhibit R (Safari x0097); Exhibit S (Safari x0197).

## G. G&L's Misappropriation of Plaintiffs' Assets and Charging Plaintiffs for Fictitious Expenses

As noted above, after filing the Complaint, Plaintiffs obtained some (but not all) of the Chase x6781 bank statements.  Those statements confirm that G&L routinely—almost daily— transferred Plaintiffs' escrowed assets to an overnight investment fund, returned the escrowed assets to Chase x6781 the following day, and then intermittently transferred dividends earned from the overnight investment activity to G&L's own operating account.  *See* Exhibit J.  The chart below summarizes information from the bank statements showing the dates and amounts that escrowed funds were transferred to and from overnight investments.

---

[10] Plaintiffs are not currently able to access all of G&L's past invoices.  The invoices attached at Exhibit AC begin in March 2024, when G&L's unauthorized investment activity began, and continue with some gaps through November 13, 2025.  In some of the attached invoices, G&L directed Plaintiffs to remit payment to its operating account, Chase x9856.  *See, e.g.*, Exhibit AC at 14, 18, 23, 27, 32, 36, 41, 45, 49, 60, 101, 104, 107, 110, 113.

| Date | Money from Chase x6781 to Overnight Investments |
|---|---|
| March 2024 | $6,942,648.02 |
| April 2024 | $12,999,217.71 |
| May 2024 | $9,511,297.72 |
| June 2024 | $7,081,717.87 |
| July 2024 | $9,925,378.05 |
| August 2024 | $5,118,949.95 |
| September 2024 | $12,939,466.09 |
| October 2024 | $35,676,283.92 |
| November 2024 | $12,685,493.31 |
| December 2024 | $25,404,977.15 |
| January 2025 | $22,861,859.07 |
| February 2025 | $17,395,744.78 |
| March 2025 | $10,216,583.71 |
| April 2025 | $4,414,842.50 |
| May 2025 | $11,895,080.79 |
| June 2025 | $14,374,474.53 |
| July 2025 | $9,673,799.46 |
| August 2025 | $13,314,268.36 |
| September 2025 | $25,953,697.54 |
| October 2025 | $9,681,713.99 |
| November 2025 | Missing Statement |
| December 2025 | $8,800,000.00 |

G&L appears to have begun the unauthorized investment activity in March 2024. Then, on most nights, G&L transferred a certain amount to the investment account and the following day the exact same amount was returned to Chase x6781. *Compare, e.g.*, Exhibit P at 4 (April 1, 2025, withdrawal of $301,468.03) *with id.* at 2 (April 2, 2025 deposit of $301,468.03). The amount G&L placed in overnight investments appeared to fluctuate nightly, with G&L typically

investing everything in the escrow account above a $25,000 daily ending balance. On any given night, G&L misappropriated anywhere between a low of $22,828.03 (May 30, 2025) and a high of $3,623,159.58 (August 27, 2025) in Plaintiffs' escrowed funds and placed those funds at risk overnight in investments. *See* Exhibit J at 103 (May 30, 2025), 121 (August 27, 2025). In total, G&L appears to have misappropriated Plaintiffs' escrowed funds on hundreds of occasions, recycling them through the overnight activity in total amounts cresting $286 million. These overnight misappropriations continued even after the Complaint was filed on December 13, 2025: in the remaining days in that month, G&L transferred Plaintiffs' escrowed funds to overnight investments an additional twelve times, in $400,000 increments totaling $4.8 million. *See* Exhibit Q at 2-3.[11]

Furthermore, G&L enriched itself in the process: dividends from the overnight investment activity were intermittently deposited into the Chase x6781 account, and G&L intermittently swept some of those dividends from the Chase x6781 account into its own Chase x9856 operating account. For example:

- On April 1, 2024, a $2,096.97 dividend payment from the overnight investment activity was deposited into Chase x6781. Exhibit K at 1. Four days later, on April 5, 2024, G&L transferred that same $2,096.97 from Chase x6781 to G&L's own operating account, Chase x9856. *Id.* at 4.

- On October 1, 2024, a $2,409.83 dividend payment from the overnight investment activity was deposited into Chase x6781. Exhibit L at 1. The same day, G&L transferred that same $2,409.83 from Chase x6781 to G&L's operating account, Chase x9856. *Id.* at

---

[11] Plaintiffs understand that G&L claims to have stopped the overnight investment activity at some point in January 2026. However, Plaintiffs have no way of confirming this information and, even if it is true, no means to prevent the investment activity from resuming.

2.

- On November 1, 2024, a $6,215.01 dividend payment from overnight investment activity was deposited into Chase x6781. Exhibit M at 1. The same day, G&L transferred that same $6,215.01 from Chase x6781 to G&L's operating account, Chase x9856. *Id.* at 2.

- On December 2, 2024, a $2,362.73 dividend payment from the overnight investment activity was deposited into Chase x6781. Exhibit N at 2. Nine days later, G&L transferred that same $2,362.73 from Chase x6781 to G&L's operating account, Chase x9856. *Id.* at 3.

- On February 3, 2025, a $3,453.05 dividend payment from the overnight investment activity was deposited into Chase x6781. Exhibit O at 1. Four days later, on February 7, 2025, G&L transferred that same $3,453.05 from Chase x6781 to G&L's operating account, Chase x9856. *Id.* at 2.

While proving the existence of misappropriation, those same bank statements prove the absence of something else: domestic and international wire fees. None of the statements list any wire transfer fees. *See* Exhibit J. On the other hand, invoices G&L issued to Plaintiffs show hundreds of wire fees G&L claimed were "expenses" for which Plaintiffs had to reimburse G&L. *See* Exhibit AC.

For example, the Chase x6781 bank statement for April 2025 shows an April 1 domestic wire transfer to A.P. for $16,700. Exhibit P at 3. The bank statement shows no wire fee associated with that transaction. *Id.* at 3, 5. The G&L invoice for that time period shows that G&L invoiced Plaintiffs $167 for an April 1 "service" identified as "[A.P.] LLC 1% Escrow Fee." (One percent of the $16,700 wire transfer equals $167). Exhibit AC at 83. The G&L invoice also shows that G&L invoiced Plaintiffs for a $20 "expense" identified as "Bank

16

Domestic Wire Transfer: [A.P.] LLC." *Id.* A simple comparison between the bank statement (which shows no fee expense) and the G&L invoice (which shows a fee expense) proves that G&L charged fictitious wire fees to Plaintiffs.

Further comparison between the same April 2025 bank statement and the G&L invoice for the same period shows even more examples. For example, the Chase x6781 bank statement shows four wire transfers to P.I. on April 1, April 9, April 17, and April 29. Exhibit P at 3, 4. The G&L invoice for that time period shows that G&L invoiced Plaintiffs for a "service" equal to "1% escrow fee" for each of the four transactions. Exhibit AC at 83-86. But G&L also invoiced Plaintiffs for an "expense" of $20 for each of the four wire transactions. *Id.* In April 2025 alone, G&L invoiced Plaintiffs for 28 domestic wire transfer "expenses" of $20 each and at least one international wire transfer "expense" of $40, totaling $600, and yet none of those supposed expenses appear on the April 2025 bank statement. *Id.*

Overall, G&L's invoices are replete with expenses for domestic and international wire transfers, with fictitious "expenses" for domestic wire fees appearing approximately 298 times for $5,960 and for international wire fees appearing approximately 96 times for $3,840. *See* Exhibit AC. Yet the bank statements for those same time periods show zero charges for wire transactions. *See* Exhibit J.

### H.    The Continuing Harm Suffered by Plaintiffs

Plaintiffs continue to suffer irreparable harm due to G&L's unlawful withholding of Plaintiffs' escrowed assets. Not having access to the escrowed assets has resulted in substantial lost business opportunities, reputational harm, and at least one lawsuit.

For example, Plaintiffs' sole member, Paul Jaber, has lost substantial business opportunities because of G&L's withholding of the escrowed assets. Exhibit AD ¶29. Most damaging, Jaber was in the process of launching a public company, called BitBridge, which was

17

to be capitalized with Jaber's funds that he expected to withdraw from his sole membership in Plaintiffs.  *Id.* ¶¶30-31.  Jaber expended substantial sums to establish BitBridge, and—without access to the funds kept in escrow by G&L—BitBridge is not current on all of its expense obligations.  *Id.* ¶32.  In addition to the lost business opportunity, Jaber has suffered substantial reputational harm from BitBridge's inability to stay current on all expense obligations and inability to achieve a public offering due to lack of capitalization.  *Id.* ¶33.

Moreover, Plaintiffs already are having to defend themselves against at least one separate lawsuit related to the escrowed assets held by G&L.  On February 19, 2026, in the Southern District of Florida, High West and Jaber were sued by BMA Capital Inc. for breach of contract and other claims.  Exhibit AE ("BMA Complaint").  BMA alleges that "monies and securities" it is owed "are sitting in an account of High West's escrow agent, the law firm of Greenberg & Lieberman."  *Id.* at 1.  BMA further alleges that "[t]he fees [BMA] earned on the underlying transaction, including the shares held at Safari Asia, are in escrow at G&L, High West's escrow agent."  *Id.* at 3 ¶12.  And the Florida federal case is not the only potential litigation related to escrowed assets: separately, Plaintiffs are in pre-litigation in Hong Kong related to shares held in accounts controlled by G&L.  Exhibit AD ¶28.

I.    **Relevant Admissions in G&L's Recently Filed Declaration**

On March 6, 2026, G&L filed a declaration from Lieberman, its member and managing partner.  ECF No. 13-1.  As discussed *infra* Section V.A.1, the Lieberman declaration includes a number of admissions that prove Plaintiffs' entitlement to succeed on its first claim for relief, which requested a declaratory judgment as to the meaning of a specific written escrow agreement.  In his declaration, Lieberman states that "the Escrow Agreement dated August 23, 2021 expired by its own terms.  After that agreement expired, no replacement standalone escrow agreement was executed between G&L and any of the entities in the Hall/Jaber client group."  *Id.*

18

¶13.    Lieberman continues: "Notwithstanding the expiration of the 2021 Escrow Agreement, G&L continued to hold and administer escrow assets and to provide escrow services for the client group, as it does to this day despite this lawsuit and the resignation.  These services were provided as part of the ongoing attorney-client relationship governed by the attorney-client agreements, which remained in effect throughout." *Id.* ¶14.

## IV.    Relevant Law

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  Granting such relief here—placing the assets into the Court's neutral hands—entirely aligns with "[t]he purpose of a preliminary injunction," which "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

A party seeking a preliminary injunction must show "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.  As this Court has observed, district courts in this Circuit continue to evaluate the four factors "on a 'sliding scale,' such that if 'the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor.'" *P.J.E.S. by and through Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 508 (D.D.C. 2020) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009)).

In determining whether the moving party has met its burden, the Court may rely on "sworn declarations in the record and other credible evidence in the record even though such

19

evidence might not meet all of the formal requirements for admissibility at a trial." *AFGE v. Dist. of Columbia*, 2005 WL 1017877, at *4 (D.D.C. May 2, 2005); *Camenisch*, 451 U.S. at 395 (preliminary injunction decision may be made "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits").

Where, as here, a moving plaintiff has pleaded multiple claims for relief, the Court need only find a likelihood of success on one claim in order to justify injunctive relief. *See Kelly v. Hegseth*, ___F. Supp. 3d___, 2026 WL 391777, at *4 (D.D.C. Feb. 12, 2026) (Though petitioner brought "seven claims, he 'need only show a likelihood of success on one to obtain preliminary relief, provided the other preliminary-injunction factors are satisfied.'") (quoting *Am. Bar Ass'n v. U.S. Dep't of Just.*, 783 F. Supp. 3d 236, 242 (D.D.C. 2025)); *Mid-Atlantic Equity Consortium v. U.S. Dep't of Educ.*, 793 F. Supp. 3d 166, 189 n.6 (D.D.C. 2025) (similar); *Kirwa v. U.S. Dep't of Defense*, 285 F. Supp. 3d 21, 35 (D.D.C. 2017) (similar).

Further, a plaintiff can make a showing of irreparable harm in a number of ways. One way is through economic injury. Though run-of-the-mill economic damages are generally insufficient to meet the standard, economic injury can constitute irreparable harm where there is "a 'strong indication'" that the assets at issue will become unrecoverable. *Sprint Solutions*, 2020 WL 136285 at *7 (quoting *Micro Signal Research, Inc. v. Otus*, 417 F.3d 28, 31 (1st. Cir. 2005)). *See e.g.*, *id.* ("Sprint argues that it will suffer irreparable harm absent an injunction because Mobile Now will continue to dissipate the $11.2 million and Sprint will be unable to recover the funds later."); *District Title v. Warren*, 181 F. Supp. 3d 16, 29 (D.D.C. 2014) (Plaintiff "successfully demonstrated that defendants [had] harmed [the plaintiff company] by retaining and distributing its funds, and that, given defendants' continued refusal to cease disbursing the funds and return them, this harm [was] likely to continue and worsen."); *Robertson v.*

20

*Cartinhour*, 429 Fed. App'x 1, 3 (D.C. Cir. 2011) (irreparable harm demonstrated where "the plaintiff has shown the defendant is likely, in furtherance of the fraud in suit, to dissipate the only assets available for relief"). *Cf. Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) (In context of stay of judgment, "[n]ormally the mere payment of money is not considered irreparable, but that is because money can usually be recovered from the person to whom it is paid. If expenditures cannot be recouped, the resulting loss may be irreparable.") (citation modified); *Mori v. Int'l Broth. of Boilermakers*, 454 U.S. 1301, 1303 (1981) ("The funds held in escrow . . . would be very difficult to recover should applicants' stay not be granted.").

Irreparable harm also can be shown "where the loss threatens the very existence of the movant's business." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). *See also Nat'l Lifeline Assoc. v. Fed. Cmcn's Comm.*, 2018 WL 4154794, at *1 (D.C. Cir. Aug. 10, 2018) ("The service provider petitioners here have shown that implementation of the Order will result in substantial, unrecoverable losses in revenue that may indeed threaten the future existence of their businesses."). For example, in *FutureGen Co. v. Carter*, the Court found that "Plaintiff has demonstrated that it may suffer irreparable economic harm if the money is not available for a judgment in the future" because, among other things, "there is a significant likelihood that the company's largest investor will terminate his relationship with FutureGen," "other investors will cease working with FutureGen," and the defendant's conduct "has exposed the company to potential lawsuits from investors." 2012 WL 12874177, at *2 (D.D.C. May 21, 2012).

Another basis for a finding of irreparable harm is reputational injury. *See S. Educ. Found. v. U.S. Dep't of Educ.*, 784 F. Supp. 3d 50, 72 (D.D.C. 2025) (finding irreparable reputational harm where the government cancelled an organization's grant that disrupted its

21

programming); *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018) (irreparable harm where company demonstrated "contract opportunities for which [it] intended to compete, and explains [its] disadvantage in light of its reputational injuries").

As part of its equitable injunctive powers, the Court can order assets deposited into the court's registry for safekeeping. *See Robertson*, 429 Fed. App'x at **1-4 (affirming district court injunction requiring transfer of covered funds into the registry of the court). Where, as here, some of the assets are securities, the Court has mechanisms to effect securing the assets, including depositing the stock certificates with the court or requiring an equivalent bond. *Cf. Madison Stock Transfer, Inc. v. Exlites Holdings Int'l, Inc.*, 368 F. Supp. 3d 460, 486 (E.D.N.Y. 2019) (interpleader plaintiff required to "deposit a bond in the value of the disputed shares or deposit the documents necessary for final disposition of the shares of stock at issue") (citation modified); *X-Clearing Corp. v. Technology Partners LLC*, 2008 WL 4090028, at *1 (D. Colo. Aug. 22, 2008) ("invocation of the interpleader remedy is appropriate with respect to . . . stock certificates").

## V. <u>Argument</u>

Plaintiffs below prove a substantial likelihood of success on the merits of their claims and that they would suffer irreparable injury if the preliminary injunction were not granted. Further, the equities favor an injunction here, as neither G&L nor any other interested party would be substantially injured and the public interest would be served.

### A. Plaintiffs Are Likely to Succeed on the Merits

The Complaint has two claims for relief. Though the Court need only find a substantial likelihood of success as to one claim, Plaintiffs are substantially likely to succeed on both.

#### 1. Plaintiffs are likely to prevail on their first claim for relief.

Because of certain admissions made by G&L in a filing on March 6, 2026, Plaintiffs'

22

entitlement to relief on their first claim for relief is clear.  The Complaint's first claim is for a declaratory judgment with four sub-claims for relief: that a specific written escrow agreement's arbitration provision (1) does not bind International Liquidity, (2) does not encompass International Liquidity's assets in the Complaint, (3) does not bind High West, and (4) does not encompass High West's assets at issue in the Complaint.

The parties agree on the legal framework the Court must follow to determine the applicability of an arbitration provision: first, the Court must decide if the parties entered into a valid arbitration agreement; and second, the Court must determine whether the arbitration agreement encompasses the claims in the Complaint.  *Sakyi v. Estee Lauder Cos.*, 308 F. Supp. 3d 366, 375 (D.D.C. 2018); ECF No. 1 ¶36 (Complaint, citing standard); ECF No. 6-1 at 6 (G&L Motion citing standard).

The only agreement for which the Complaint seeks a declaratory judgment is the written escrow agreement—not the attorney-client agreements raised by G&L.  The escrow agreement here, dated August 23, 2021, is titled "Single-Party Escrow Agreement."  Exhibit AF.  The "Single Party" identified by name in the document is Plaintiff "High West Capital Partners, LLC."  The only escrow assets identified in the agreement were 909 shares of common stock— which the verified Complaint states are not at issue in this lawsuit.  *See* ECF No. 1 ¶33 ("The claims raised herein do not arise out of or relate to the escrow of the 909 shares of SPY common stock, but rather to other funds, securities, and assets held in escrow by G&L several years after the expiration date of the Putative Expired G&L Escrow Agreement.").

G&L's position—as taken directly from a declaration by its member and managing partner—is that the written escrow agreement "expired by its own terms" several years ago, that "no replacement standalone escrow agreement was executed between G&L and any of the

23

entities in the Hall/Jaber client group," and that all subsequent escrow "services were provided as part of the ongoing attorney-client relationship governed by the attorney-client agreements." ECF No. 13-1 ¶¶13-14.  The result of these admissions is that Lieberman implicitly agrees that the written escrow agreement (1) does not bind International Liquidity, (2) does not encompass International Liquidity's assets, (3) does not bind High West except with respect to the 909 shares of stock specified in the escrow agreement that are not part of this lawsuit, and (4) does not encompass High West's assets implicated by the Complaint.

In G&L's view, as averred by Lieberman, Plaintiffs are bound by various arbitration provisions in the attorney-client agreements—but whatever the merits of that argument, it has nothing to do with whether International Liquidity is bound by the written escrow agreement. Both parties now agree that it is not.  And Plaintiffs' view of the arbitration provisions in the attorney-client agreements also has nothing to do with whether the written escrow agreement encompasses High West's assets, other than assets not at issue in the Complaint.  Again, both parties now agree that it does not.  Therefore, Plaintiffs are not just likely to prevail on this first claim for relief seeking a declaratory judgment as to the written escrow agreement—no genuine dispute of material fact exists, and Plaintiffs are entitled to relief.

### 2.  Plaintiffs are likely to prevail on their second claim for relief.

Plaintiffs' second claim for relief alleges that G&L breached its fiduciary duty of loyalty in three ways: (1) using Plaintiffs' funds for its own benefit; (2) failing to maintain proper trust accounts for Plaintiffs' escrowed funds; and (3) improperly commingling Plaintiffs' funds with G&L's own funds. ECF No. 1 ¶40.  These actions by G&L occurred while Plaintiffs placed with G&L over $40 million in assets—including funds, securities, and cryptocurrency—in escrow accounts in, at least, the United States and Hong Kong.  ECF No. 1 ¶41.

24

The elements for breach of fiduciary duty are straightforward: the plaintiff must prove that (1) the defendant had a fiduciary duty to the plaintiff, (2) the defendant violated that duty, and (3) if compensatory damages are sought (as they are here, in part) the breach proximately caused an injury. *See Bode & Grenier, LLP v. Knight*, 821 F. Supp. 2d 57, 64 (D.D.C. 2011). There is no question that G&L and Lieberman owed fiduciary duties to Plaintiffs. *See Gov't of Rwanda v. Rwanda Working Group*, 227 F. Supp. 2d 45, 64 (D.D.C. 2002) ("Like other agents, lawyers owe their clients a duty of loyalty and a duty of care."); D.C. Rule of Prof. Conduct 1.15, Cmt. 1 (attorneys "should hold property of others with the care required of a professional fiduciary"). Those duties extend to all work performed by attorneys for clients, not just legal services. *Rwanda Working Group*, 227 F. Supp. 2d at 64 ("The fiduciary duties owed by an attorney to a client extend to all matters in which the attorney is involved, not simply the ones in which he is expressly retained as legal counsel and receives legal fees."). Since the D.C. Rules of Professional Conduct form the backbone of an attorney's obligation to his clients, "a violation of the Rules of Professional Conduct 'can constitute a breach of the attorney's common law fiduciary duty to the client.'" *So v. Suchanek*, 670 F.3d 1304, 1307-08 (D.C. Cir. 2012) (quoting *Griva v. Davison*, 637 A.2d 830, 846-47 (D.C. 1994)). Those rules are discussed where relevant below.

### a.   G&L used Plaintiffs' funds for G&L's own benefit

The Complaint alleges that (1) G&L misappropriated Plaintiffs' escrowed funds by removing those funds from Chase x6781 without Plaintiffs' knowledge or consent, putting those escrowed assets at market risk in overnight investment activity, and then siphoning dividends from those investments into G&L's own accounts; and (2) G&L issued invoices with "fictitious

bank and ACH fees." ECF No. 1 ¶42.[12]

### i.    Overnight investment activity

We begin with the overnight investment activity, which constitutes the largest misappropriation of Plaintiffs' assets and for which the evidence of misappropriation is overwhelming. Misappropriation is defined as "'any unauthorized use of client's funds entrusted to [a lawyer], including not only stealing but also unauthorized temporary use for the lawyer's own purpose, whether or not [he] derives any personal gain or benefit therefrom.'" *In re Alexander*, 865 A.2d 541, 543 (D.C. 2005) (quoting *In re Berryman*, 764 A.2d 760, 768 (D.C. 2000)).

The Complaint alleges that in 2024 and 2025, G&L misappropriated Plaintiffs' funds held in escrow in Chase Bank Account x6781. ECF No. 1 ¶13. The misappropriation occurred when G&L removed escrowed funds, placed them at risk overnight in an investment, returned the funds to the Chase x6781 account the following day, and siphoned some of the dividends from the overnight investment into G&L's separate operating account, Chase x9856. ECF No. 1 ¶13(a) & (b). Further, G&L concealed its misappropriations by not including its overnight investment activity on reconciliations sent to Plaintiffs and instructing G&L's staff not to provide Chase x6781 account statements to Plaintiffs. ECF No. 1 ¶13(c), (d).

After filing the Complaint, Plaintiffs obtained some (but not all) of the Chase x6781 bank statements. *See In re Mitrano*, 952 A.2d 901, 925 (D.C. Ct. App. 2008) ("Misappropriation is often proven by examining the account records of the financial institution in which the attorney had deposited client funds."). Those statements confirm the Complaint's allegations. The chart

---

[12] The Complaint also alleges that G&L issued invoices with "undisclosed mark-ups on document execution fees charged by [G&L]." ECF No. 1 ¶42. Plaintiffs are not relying on that allegation for purposes of this preliminary injunction motion.

in Section III.G, *supra*, summarizes the information in the bank statements, showing the dates and amounts that escrowed funds were transferred to overnight investments.   In total, G&L misappropriated over $286 million of Plaintiffs' escrowed funds over the course of at least 21 months.   These overnight misappropriations occurred twelve times even after the Complaint was filed.   Exhibit Q at 2-3.   And G&L itself benefited from this unauthorized misappropriation of Plaintiffs' assets.   For but one example, the April 2024 bank statement shows G&L transferring a $2,096.97 dividend payment from Chase x6781 to its own operating account, Chase x9856.   Exhibit K at 1, 4.

Since there is irrefutable documentary proof that the activity occurred, the Court should turn next to whether the activity was authorized.   It was not.   According to the verified Complaint, "[a]t no time did [Plaintiffs] ever authorize G&L to use any of the funds or assets held in escrow for its own purposes on a temporary basis to derive a gain or benefit for itself therefrom."   ECF No. 1 ¶41.   And more specifically, G&L "never, at any time, obtained prior knowing consent from [Plaintiffs] to invest their escrow funds at risk overnight for G&L's own benefit."   *Id.*

Further, G&L's contemporaneous concealment of these activities supports a determination not only that the overnight investments were unauthorized, but also that G&L knew it, and they were not the result of any mistake or accident.   The overnight investments shown on the bank statements appear nowhere on reconciliation documents provided to Plaintiffs by G&L.   *Compare, e.g.*, Exhibit K at 5-6 (bank statement showing activity) *with* Exhibit AG (reconciliation spreadsheet "Activity" tab not showing activity).[13]   Nor do the skimmed dividend

---

[13] The G&L email included other attachments which Plaintiffs have not included in Exhibit AG. Moreover, the relevant Excel spreadsheet has additional tabs, but the most relevant tab is included in Exhibit AG.  The entire original Excel file is available for the Court's review.

payments.  *Compare* Exhibit K at 1 (showing April 1, 2024, deposit into Chase x6781 of $2,096.97 dividend payment from overnight investments) and 4 (showing April 5, 2024, transfer of $2,096.97 from Chase x6781 G&L's Chase x9856 operating account) *with* Exhibit AG (reconciliation spreadsheet "Activity" tab not showing activity).

G&L has not answered the Complaint nor—yet—submitted a declaration to explain how the unauthorized overnight investments and misappropriation of dividends thereon did not violate its fiduciary duties toward Plaintiffs.  We do know, though, that in a motion to dismiss G&L attempted to cast the Complaint's allegations as mere "fee disputes."  *See, e.g.*, ECF No. 6-1 at 3, 8, 9, 11.  If that is the foundation upon which any opposition to this preliminary injunction motion rests, then the record will discredit that justification.

Plaintiffs and G&L agree that their relationship began in or about early 2021.  ECF No. 1 ¶10 (March 2021); ECF No. 13-1 ¶3 (May 2021).  The parties disagree whether G&L's escrow services fall under the attorney-client agreement.  If G&L is correct, then the attorney-client agreements control.  *See* ECF No. 13-1 ¶14 ("These services were provided as part of the ongoing attorney-client relationship governed by the attorney-client agreements.").  Those agreements, in accord with Rule of Professional Conduct 1.5's command that "the basis or rate of the fee" be reduced to writing for then-new clients, state that G&L "will advise the Client(s) on the specific matters assigned to the Firm by the Client(s) as outlined on the attached or subsequently signed HOURLY SCHEDULE(S) and/or FIXED FEE SCHEDULE(S), each of which are incorporated in this Agreement by reference."  ECF No. 6-2 ¶2(c); ECF No. 6-3 ¶2(c); ECF No. 6-4¶2(c).  None of the attorney-client agreements filed by G&L have "attached or subsequently signed" hourly fee or fixed fee schedules.  *Id.*  The agreements do, however, go on to specify that "[o]ther than services provided on a flat fee/fixed fee basis, legal services are

provided by the Firm's attorneys on an hourly basis at the rate of <u>$300-$750 per hour,</u>" with those hourly rates subject to annual review and adjustment.  ECF No. 6-2 ¶3(b); ECF No. 6-3 ¶3(b); ECF No. 6-4 ¶3(b).  The attorney-client agreements, unsurprisingly, do not reference any G&L plan or authorization to take Plaintiffs' escrowed assets, place them at risk in overnight investments, and then shuffle the dividends earned from those overnight investments into G&L's own coffers.

The record establishes a substantial likelihood of success on the merits.  G&L improperly took Plaintiffs' escrowed assets and used them for G&L's personal benefit.  *See In re Alexander*, 865 A.2d at 543 (including "unauthorized temporary use" in definition of misappropriation).  *See also In re Pierson*, 690 A.2d 941, 942 (D.C. 1997) (attorney disbarred for using client escrow account to pay her general business expenses).  These facts prove that G&L owed a fiduciary duty to Plaintiffs, G&L violated that duty, and Plaintiffs suffered injury from those violations.

### ii.    Fictitious bank and ACH fees

The Complaint alleges that G&L charged Plaintiffs "fictitious domestic and foreign bank wire fees and ACH fees in its escrow invoices."  ECF No. 1 ¶¶17, 42.  A simple comparison between the G&L invoices and the Chase x6781 bank statements proves up this claim.  As detailed in Section III.G, *supra*, the bank statement for the single month of April 2025 shows that G&L invoiced Plaintiffs for 28 domestic wire transfer "expenses" of $20 each and at least one international wire transfer "expense" of $40, totaling $600, and yet none of those supposed expenses appear on the April 2025 bank statement.  In total, G&L's invoices charged Plaintiffs approximately $9,800 for "expenses" it never incurred for approximately 394 domestic and international wire transfers.  These bank statements show that G&L violated its fiduciary duty to Plaintiffs.  Plaintiffs suffered injury from the violation by paying G&L for the fictitious fees.

29

### b. G&L failed to maintain proper trust accounts for escrowed funds

As discussed *supra*, Rule 1.15 of the D.C. Rules of Professional Conduct requires an attorney to keep a client's funds separate from his own "in one or more trust accounts" at an "approved depository" labeled, as relevant here, a "Trust Account" or "Escrow Account." G&L kept millions of dollars in Plaintiffs' escrowed assets in Chase x6781. *See, e.g.*, Exhibit Q. Bank statements for that account state merely that it is in the name of G&L, at the address of G&L's principal place of business in the District of Columbia. *Id.* Nowhere on the statement is the account identified as a "Trust Account" or "Escrow Account." *Id.* Nor do the bank statements show that Chase x6781 is anything other than a normal business checking account in G&L's name—one that G&L also used as an operating account, to accept fees for its escrow services. *See* Exhibit AC at 9, 51, 54, 56, 69, 86. Similarly, the Safari Asia statements for Safari x0097 and Safari x0197 are held in G&L's name, and do not suggest that they are "trust accounts" or "escrow accounts." *See, e.g.*, Exhibit R (Safari x0097); Exhibit S (Safari x0197).

Accordingly, G&L owed Plaintiffs a duty, and G&L violated that duty. Whether Plaintiffs suffered economic injury from this violation is beside the point, because the Complaint also seeks injunctive relief and an accounting.

### c. G&L commingled Plaintiffs' funds with G&L funds

The evidence above further shows that G&L improperly comingled its own funds with those of Plaintiffs, and perhaps other clients as well. According to G&L, Chase x6781 was an "escrow account[]" that held "multiple client's funds." Exhibit A ("Let me be blunt. 6781 and 7230 are escrow accounts which hold multiple client's funds. You are not getting the statements."). Yet G&L also frequently directed Plaintiffs to pay G&L's invoices by remitting payment to Chase x6781. Exhibit AC at 9, 51, 54, 56, 69, 86 (invoices showing where to remit

30

payment).  Since an attorney is required to keep his own funds (such as fees earned for services provided) separate from his clients (such as escrowed assets), *see* Rule 1.15, G&L both had and breached a fiduciary duty to Plaintiffs.  Injunctive relief and an accounting are appropriate.

### B.  Plaintiffs Will Suffer Irreparable Harm Absent Immediate Relief

Plaintiffs are suffering irreparable harm due to G&L's continued possession of assets to which it has disclaimed entitlement.  First, G&L has shown a "strong indication" that G&L may dissipate the assets, thereby making them unrecoverable.  *See Sprint Solutions*, 2020 WL 136285, at \*7.  Second, not having access to the escrowed assets held by G&L has resulted in substantial lost business opportunities, reputational harm, and at least one lawsuit.  Exhibit AE; s*ee Nat'l Lifeline Assoc.*, 2018 WL 4154794, at \*1 ("The service provider petitioners here have shown that implementation of the Order will result in substantial, unrecoverable losses in revenue that may indeed threaten the future existence of their businesses."); *FutureGen Co.*, 2012 WL 12874177, at \*2 (irreparable harm where "Plaintiff has demonstrated that it may suffer irreparable economic harm if the money is not available for a judgment in the future" because, among other things, "there is a significant likelihood that the company's largest investor will terminate his relationship with FutureGen," "other investors will cease working with FutureGen," and the defendant's conduct "has exposed the company to potential lawsuits from investors.").

### 1.  Plaintiffs have shown a strong indication that G&L may dissipate assets—knowingly or not

G&L is holding tens of millions of dollars in Plaintiffs' escrowed assets.  Yet it has demonstrated—very recently and very publicly—that it cannot control its escrowed assets.  *See supra* Section III.D.   After the Complaint was filed, Lieberman—by his own verified admission—was tricked into providing information to thieves that enabled them to steal $2.7

million of escrowed funds.  Exhibit G ¶42.  G&L has never said whether any of the stolen cryptocurrency assets originated from Plaintiffs or involved Plaintiffs' assets.  But even if they did not, G&L still cannot be trusted to hold on to Plaintiffs' assets without substantial risk of loss.

By his own admission, Lieberman's laptop was not "protected" for roughly two months.  Exhibit G ¶33.  In that time period, Lieberman drafted and sent to Plaintiffs at least the Second Draft Interpleader, *see* Exhibit D (November 20, 2025), and Third Draft Interpleader, *see* Exhibit E (November 23, 2025), setting out some of Plaintiffs' specific escrow assets and a total amount of over $25 million.  Anyone with access to Lieberman's laptop—even the thieves who, according to the Maryland Complaint, later stole the cryptocurrency—could have seen that information, information that based on dollar amount alone puts a bullseye on Plaintiffs' escrowed assets.

Moreover, it is almost inconceivable that Lieberman—acting as an escrow agent over millions of dollars—did not put other credentials at risk, such as login information to the online Chase Bank system for Chase x6871 or other systems that control passwords or banking information for Plaintiff's escrowed funds.  In G&L's own words, "[t]he threat of dissipation is not speculative—it is the defining characteristic of digital asset theft."  Exhibit H at 6.  Plaintiffs' future should not rest on an unfounded hope that Lieberman did not already place login credentials for Plaintiffs' escrow accounts at risk and will not once again fall prey to thieves who steal information sufficient to let them deplete Plaintiffs' escrowed assets.  No award of money damages after the fact can make Plaintiffs whole if the accounts are drained—and therefore unrecoverable—before judgment.  *See Sprint Solutions*, 2020 WL 136285 at *7 ("Sprint argues that it will suffer irreparable harm absent an injunction because Mobile Now will continue to

32

dissipate the $11.2 million and Sprint will be unable to recover the funds later."); *District Title*, 181 F. Supp. 3d at 20 (plaintiff "successfully demonstrated that defendants [had] harmed [the plaintiff company] by retaining and distributing its funds, and that, given defendants' continued refusal to cease disbursing the funds and return them, this harm [was] likely to continue and worsen."). The record, therefore, establishes at least a "strong indication" that G&L may dissipate Plaintiffs' assets, even unintentionally. *Sprint Solutions*, 2020 WL 136285. at *7 (citation modified).

But the record establishes even more probability of unrecoverability. After the Complaint was filed, G&L intentionally placed Plaintiffs' escrowed assets at risk of unrecoverable dissipation by continuing the very unauthorized investment activity the Complaint alleged harmed Plaintiffs. At least through December 2025, G&L continued to place millions of Plaintiffs' dollars at risk in unauthorized investment activity. Plaintiffs have no way of confirming G&L's late and unverified representation that the overnight investment activity stopped in January 2026, and no way of preventing the recommencement of that activity at any time G&L chooses.

In addition, the value of certain escrowed securities held by G&L has tanked in the three months since the Complaint was filed. One of the stocks plummeted 56% in that time; two other stocks lost over 18% of their value. *See* Exhibit R; Exhibit S; Exhibit U; Exhibit V; Exhibit W; *see also Xiaomi Corp. v. Dep't of Defense*, 2021 WL 950144, at *11 (D.D.C. Mar. 12, 2021) (irreparable harm from 9.5% decrease in stock price that resulted in loss of $10 billion in market capitalization). In total, the stock assets have lost approximately $6,000,000 USD in value since Plaintiffs filed the Complaint. Even if the stock paper itself is recoverable, the value of the stock is not. G&L should not be permitted to continue to harm Plaintiffs with its sole control over

33

stock that is subject to daily market fluctuations.  The unrecoverability of those missing assets is patent.

Finally, though perhaps technical, it is important that G&L cannot even observe its own corporate formalities.  *See supra* Section III.F.  Its business registration in the District of Columbia has been revoked for almost three years.  Exhibit Y; Exhibit AA.  Its bank accounts are improperly labeled and commingle assets between clients and G&L.  *See supra* Section III.F. If the Court cannot have faith in G&L to do the minimum paperwork required to keep itself in good standing or to separate client funds from G&L's own, it should not have faith in G&L to preserve Plaintiffs' substantial assets.

## 2.    Plaintiffs will suffer other irreparable harm

Plaintiffs continue to suffer other irreparable harm due to G&L's unlawful withholding of Plaintiffs' escrowed assets.  Not having access to the escrowed assets has resulted in substantial lost business opportunities, reputational harm, and at least one lawsuit.  Plaintiffs' sole member, Paul Jaber, has lost substantial business opportunities because of G&L's withholding of the escrowed assets.  Exhibit AD ¶29.  BitBridge, the public company Jaber intended to launch using certain assets to which he was entitled as Plaintiffs' sole member, has stalled.  *Id.* ¶¶30-31; *see Nat'l Lifeline Assoc.*, 2018 WL 4154794, at *1 (irreparable harm from threat to "future existence of their businesses").  Bills have gone unpaid because of lack of access to the escrowed assets. *Id.* ¶32.  Jaber's reputation has been damaged because of the unpaid bills.  Exhibit AD ¶33; *see S. Educ. Found.*, 784 F. Supp. 3d at 72; *Beacon Assocs.*, 308 F. Supp. 3d at 288 (finding irreparable reputational harm).

Moreover, Plaintiff High West Capital Partners already is having to defend itself against at least one separate lawsuit related to the escrowed assets held by G&L.  On February 19, 2026,

34

in the Southern District of Florida, High West and Jaber were sued by BMA Capital Inc. for breach of contract and other claims. Exhibit AE. The core of BMA's complaint is that it has not been paid from the escrowed assets held by G&L. *Id.* at 1 & ¶12. *Cf. FutureGen*, 2012 WL 12874177, at *2 (irreparable injury where defendant's conduct exposed plaintiff "to potential lawsuits from investors"). And High West Capital Partners may face another suit in Hong Kong related to other escrowed assets controlled by G&L. Exhibit AD ¶28.

### C. The Equitable Factors Strongly Favor Injunctive Relief

The third and fourth factors the Court considers in deciding whether a preliminary injunction is appropriate is whether G&L or other interested parties would be injured by the injunction and whether the public interest would be furthered by the injunction. *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. Here, the balance of equities strongly favors Plaintiffs.

Neither G&L nor any third party will be injured by placing the escrowed assets with the Court. For months, in writings to Plaintiffs and to the Court, G&L repeatedly has enunciated its willingness to place Plaintiffs' escrowed assets in the Court's registry. *See* Exhibits B (10/18/25 email); Exhibit A (10/28/25 resignation letter); Exhibit C (First Draft Interpleader); Exhibit D (Second Draft Interpleader); Exhibit E (Third Draft Interpleader); ECF No. 6-1 at 4 (G&L "does not object to depositing funds into the Court Registry if the Court determines that interpleader is appropriate, subject to appropriate reservations and protection."). Even now, in conferring on this motion, G&L states that it consents to the motion with respect to cash assets but does not consent with respect to the securities. Its failure to act on its own to secure the escrowed assets with the Court is why we are here. G&L cannot be harmed by ridding itself of assets to which it has disclaimed any interest.

35

In partial opposition to this motion, G&L may raise the prospect—as it did in its joinder motion, ECF No. 7—that a third party, John Hall, has an interest in Plaintiffs' escrowed assets. Plaintiffs dispute that Hall has an interest, but even if he does, Hall will be in no worse a position with an injunction than without; the funds will be placed in the Court's neutral hands, and further proceedings over their disposition can commence if appropriate.

As to the public interest, it generally is true that "[t]here is little public interest at stake in a monetary dispute between two private companies." *Sprint Solutions*, 2020 WL 136285, at *9. Still, in this case, the public interest factor tips in favor of injunctive relief because it would serve the public's interest in ensuring that fiduciaries are not allowed to improperly hold on to—and misappropriate—assets not their own.  Instead, injunctive relief here may discourage such conduct in the future from other bad actors.

*     *     *

Plaintiffs have more than met each of the four factors the Court must assess in determining whether preliminary injunctive relief is appropriate.  The evidence on each factor is strong.  Whether the Court uses a "sliding scale" or otherwise, Plaintiffs are entitled to relief.

## VI.    The Court Should Waive Any Bond Requirement

Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  The Court has broad discretion here, "'including the discretion to require no bond at all.'"  *P.J.E.S.*, 502 F. Supp. 3d at 520 (quoting *Simms v. Dist. of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012)).  Here, the Court should waive any bond requirement, because G&L will not suffer any "costs and damages" from being "wrongfully enjoined or restrained."  Fed. R. Civ. P.

36

65(c). As described above, G&L has repeatedly disclaimed interest in the escrowed assets Plaintiffs seek to place with the Court. *See, e.g.*, Exhibit C at 7 ("G&L has no interest in the Escrow Assets other than for its reasonable fees and costs as escrow agent, which it reserves the right to seek from the interpleaded funds."). Indeed, G&L on multiple occasions has stated that it would undertake an interpleader action that would result in the same relief sought by this preliminary injunction motion; its failure to follow through on filing for interpleader does not mean it has an interest in Plaintiffs' assets. *See* Exhibits A; Exhibit B; Exhibit C; Exhibit D; Exhibit E; ECF No. 6-1 at 4. If G&L has no interest in the escrowed assets, it cannot suffer harm from even wrongfully being ordered to discharge those assets to the Court. No bond is required in this circumstance.

## VII.    **Plaintiffs' Position on A Hearing**

Plaintiffs believe that the proof of their entitlement to relief is so strong that no hearing on this motion is necessary. Accordingly, Plaintiffs seek an expeditious ruling on the papers. *See* LCvR 7(f) & 65.1(d). A prompt grant of this motion is essential to preserve the status quo and prevent the dissipation of assets and irreparable harm identified throughout this motion. If the Court determines that a hearing is appropriate, Plaintiffs request that the hearing occur at the earliest possible opportunity. In advance of any such hearing, Plaintiffs reserve the right to propose live testimony from, at minimum, Stevan Lieberman, G&L's member and managing partner.

## VIII.    **Conclusion**

For all these reasons, the Court should grant Plaintiffs' motion and enter a preliminary injunction, as set forth in the attached proposed order.

38

Respectfully submitted,

*/s/ Thomas P. Windom*
Thomas P. Windom (D.C. Bar No. 502131)

Heaphy, Smith, Harbach & Windom, LLP
1701 Pennsylvania Ave. NW
Suite 200
Washington, D.C. 20006
(202) 739-8490
twindom@hshw.com

*Counsel for Plaintiff*